# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### EASTERN DIVISION

**UNITED STATES ex rel. DARLENE**
**THOMAS and JOHN O'NEILL,**                           **RELATORS**

**v.**                           **CIVIL ACTION NO. 2:16-CV-143-KS-MTP**

**ST. JOSEPH HOSPICE, LLC, *et al.***                           **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

The Court **grants in part and denies in part** Defendants' Motion to Dismiss [47], as provided below.

### I. BACKGROUND

This is a qui tam action under the False Claims Act ("FCA").[1] Defendants provide hospice services. Relator John O'Neill was the Executive Director of Defendants' office in Biloxi, Mississippi, and Relator Darlene Thomas was the Director of Nursing at Defendants' office in Hattiesburg, Mississippi. They claim that Defendants violated the FCA and the Anti-Kickback Statute ("AKS")[2] by providing bonuses and incentives to medical directors and employees for referrals, improper certifications of terminal illness, and improper alterations of patient diagnoses to maintain Medicare reimbursement status. Defendants filed a Motion to Dismiss [47], which the Court now addresses.

---

[1] 31 U.S.C. § 3729, *et seq.*
[2] 42 U.S.C. § 1320a-7b(b).

## II. Public Disclosure Bar

Some of Relators' FCA claims are premised upon violations of the AKS, and some are premised upon violations of other laws and/or other improprieties. The non-AKS claims can be categorized as follows. First, Relators allege that Defendants' Medical Director made "improper referrals." Complaint at 3, *United States ex rel. Thomas v. St. Joseph Hospice, LLC*, No. 2:16-CV-143-KS-MTP (S.D. Miss. Sept. 4, 2016), ECF No. 3. They allege that Defendants' medical directors would write referrals themselves rather than the patients' treating physicians, referring patients who did not meet hospice criteria. *Id.* at 14-15. Second, Relators allege that Defendants "made it a company-wide practice to backdate" Certifications of Terminal Illness ("CTI's"), which were required by Medicare regulations before payment of hospice claims. *Id.* at 15. Third, Relators allege that Defendants "instructed staff to change patient diagnos[es]" to different codes that Medicare would reimburse. *Id.* at 16. Fourth, Relators allege that Defendants provided inadequate patient care by understaffing and failing to provide commonly used medications to their patients. *Id.* at 17-18. Defendants argue that the Court must dismiss these non-AKS claims pursuant to 31 U.S.C. § 3730(a)(4)(A)'s public disclosure bar.

"[T]he Fifth Circuit has noted that a challenge under the FCA's public disclosure bar should be treated as a motion for summary judgment, as it is necessarily intertwined with the merits of the case." *United States ex rel. Jamison v. McKesson Corp.*, No. 2:08-CV-214-SA-DAS, 2010 WL 1276712, at *1 (N.D. Miss. Mar. 25, 2010), *aff'd*, 649 F.3d 322 (5th Cir. 2011). Therefore, although Defendants framed

their argument under Rule 12(b)(6), Rule 56 applies.[3]

Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010). The Court is not permitted to make credibility determinations or weigh the evidence. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009). When deciding whether a genuine fact issue exists, "the court must view the facts and the inference to be drawn therefrom in the light most favorable to the nonmoving party." *Sierra Club, Inc.*, 627 F.3d at 138. However, "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002).

The FCA provides:

(A) The Court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed –

  (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;

---

[3] The Court provided notice to the parties that it intended to apply Rule 56 and gave Relators an opportunity to present evidence in support of their response to Defendants' motion. *See* Order, *United States ex rel. Thomas v. St. Joseph Hospice, LLC*, No. 2:16-CV-143-KS-MTP (S.D. Miss. Oct. 4, 2018), ECF No. 52.

(ii)   in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or

(iii)   from the news media,

unless the action is brought by the Attorney General or the person bringing the action is the original source of the information.

(B)   For purposes of this paragraph, "original source" means an individual who either (1) prior to a public disclosure under subsection (e)(4)(A), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4). Therefore, the Court must compare Relators' allegations with "public disclosures available at the time the complaint was filed." *United States ex rel. Solomon v. Lockheed Martin Corp.*, 878 F.3d 139, 144 (5th Cir. 2017). The Court applies a three-part test, "asking 1) whether there has been a public disclosure of allegations or transactions, 2) whether the qui tam action is based upon such publicly disclosed allegations, and 3) if so, whether the relator is the original source of the information." *Id.* at 143 (punctuation omitted). But the analysis is flexible, and the Court may combine steps when expedient. *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 327 (5th Cir. 2011).

The party raising the public disclosure bar "must first point to documents plausibly containing allegations or transactions on which [the relator's] complaint is based." *Id.* Then, "to survive summary judgment, [the relator] must produce evidence sufficient to show that there is a genuine issue of material fact as to whether his

action was based on those public disclosures." *Id.* The Court views the relator's evidence "in the light most favorable to him," *id.*, and the Court looks at the relator's "original complaint to define the scope of his action and to determine whether it was based on public disclosures of allegations or transactions," rather than any subsequent amended complaints. *Id.* at 328.[4]

First, the Court must determine whether the allegations or transactions of Relators' initial Complaint had already been publicly disclosed at the time this suit was filed. According to the statute, a public disclosure occurs when the allegations or transactions are disclosed in "a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;" "in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation;" or by the "news media." 31 U.S.C. § 3730(e)(4)(A). Defendants must only identify public disclosures that could plausibly be the source of Relators" FCA claims. *Solomon*, 878 F.3d at 144.

## A.    *Prior Qui Tam Complaint*

First, Defendants contend that Relators' claims were publicly disclosed in the

---

[4] Past versions of the statute specified that the public disclosure bar was jurisdictional in nature, *see Solomon*, 878 F.3d at 143, but the statute was amended in 2010. After the amendment, the Fifth Circuit held that "the public disclosure bar is no longer jurisdictional." *Abbot v. BP Exploration & Prod., Inc.*, 851 F.3d 384, 387 n. 2 (5th Cir. 2017). But the Fifth Circuit's previous holding that courts must examine a relator's original complaint when applying the public disclosure bar was premised upon the jurisdictional nature of the statute. *See Jamison*, 649 F.3d at 328. The Fifth Circuit has not revisited the question of whether courts should consider amended pleadings since clarifying that the public disclosure bar is no longer jurisdictional in nature. Therefore, absent further clarification of the amendment's practical implications, the Court will assume that the applicable standard of review and burdens of proof remain the same.

complaint of a prior *qui tam* action. *See* Complaint, *United States ex rel. Diamond v. St. Joseph Hospice*, No. 1:12-CV-393-LG-JCG (S.D. Miss. Dec. 14, 2012), ECF No. 2; Exhibit 2 to Motion, *United States ex rel. Thomas v. St. Joseph Hospice, LLC*, No. 2:16-CV-143-KS-MTP (S.D. Miss. Aug. 27, 2018), ECF No. 47-3. In *Diamond*, the relators were Defendant's employees. Exhibit 2 [47-3], at 2. They made the following allegations:

- "Defendants routinely admit into hospice patients who are not eligible to receive hospice benefits from Medicare Part A." *Id.* at 5.

- "Defendants falsify patients' life expectancy in order to qualify those patients for hospice reimbursement from Medicare, maintain patients on hospice after their medical condition has stabilized rather than discharging them from hospice as required by Medicare regulations, and exaggerate patients' signs and symptoms in order to qualify them for hospice reimbursement for Medicare." *Id.* at 5-6.

- "Defendants aggressively market continuous care hospice services and routinely bill continuous care services to the government for patients who do not qualify for that level of care." *Id.* at 6.

- "Defendant St. Joseph Hospice, through its marketers and other staff, engaged in a concerted effort to convince hospitals and the families of hospice patients that hospice patients should be enrolled in St. Joseph's continuous care hospice program," by making certain representations to hospital administrators and the families of hospice patients. *Id.* 6. "As a result of these efforts, the continuous care revenues of St. Joseph increased from $26,000 in 2009 to $373,000 in 2010, $2.57 million in 2011, and $3.9 million from January 1, 2012, through August 31, 2012." *Id.* at 7.

- Relators alleged that they reviewed patient charts for "numerous Medicare beneficiaries" and discovered that "a substantial

percentage of patients enrolled with St. Joseph were not eligible for the Medicare hospice benefit," and that "a substantial percentage of St. Joseph patients from whom continuous care services were billed were not in crisis situations at the time those claims were submitted and therefore did not qualify for the continuous care benefit." *Id.*

- Finally, in *Diamond*, the Relators provided a list of patients admitted by St. Joseph who did not actually qualify for hospice care. *See* Exhibits A & B to Complaint, *United States ex rel. Diamond v. St. Joseph Hospice*, No. 1:12-CV-393-LG-JCG (S.D. Miss. Dec. 14, 2012), ECF No. 2-2, 2-3.

These allegations are substantially identical to Relators' allegations of improper referrals, and, therefore, the Court concludes that they could plausibly be the source of those claims.

Next, the Court must determine whether Relators' Complaint was "based upon" the public disclosures. *Jamison*, 649 F.3d at 331. "A plaintiff's FCA complaint is based upon public disclosures if one could have produced the substance of the complaint merely by synthesizing the public disclosures' description of the joint venture scheme." *Solomon*, 878 F.3d at 144. "[T]he publicly disclosed allegations or transactions need only be as broad and as detailed as those in the relator's complaint . . . ." *Jamison*, 649 F.3d at 327. "The public disclosures must therefore provide specific details about the fraudulent scheme and the types of actors involved in it sufficient to set the government on the trail of the fraud." *Solomon*, 878 F.3d at 144 (quoting *Jamison*, 649 F.3d at 329).

The Fifth Circuit has adopted a test to determine "whether public disclosures contain sufficient indicia of an FCA violation to bar a subsequently filed FCA

complaint." *Id.*

> [T]he combination of X and Y must be revealed, from which the readers or listeners may infer Z. Z is an inference of fraud under the FCA, while the X and Y are two required elements for the inference: a misrepresented state of facts *and* a true state of facts. The presence of one or the other in the public domain, but not both, cannot be expected to set government investigation on the trail of fraud.

*Id.* (citing *United States ex rel. Colquitt v. Abbot Labs.*, 858 F.3d 365, 374 (5th Cir. 2017); *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994)).

In the Court's opinion, Relators "could have produced the substance" of the improper referral allegations "merely by synthesizing" the allegations of the *Diamond* complaint. *Id.* The *Diamond* relators alleged a substantially similar scheme involving the referral of patients who did not qualify for hospice services. Therefore, the Court finds that the current Complaint's allegations of improper referrals were "based on" the prior disclosure in the *Diamond* case.

Although Relators' allegations of improper referrals were based on a prior public disclosure, those claims may proceed if Relators are the "original source" of the publicly disclosed information. *Id.* at 146. The statute defines an "original source" as:

> . . . an individual who either (1) prior to a public disclosure under subsection (e)(4)(A), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4)(B). The Fifth Circuit uses a two-part test when applying the

original-source exception: "(1) the relator must demonstrate that he or she has direct and independent knowledge of the information on which the allegations are based and (2) the relator must demonstrate that he or she has voluntarily provided the information to the Government before filing his or her qui tam action." *Solomon*, 878 F.3d at 146 (quoting *United States ex rel. Reagan v. E. Tex. Med. Ctr. Regional Healthcare Sys.*, 384 F.3d 168, 177 (5th Cir. 2004)).

Relators have not alleged or provided any evidence that they disclosed the information regarding improper referrals to the Government prior to the disclosure of similar claims in the prior *qui tam* action. *See* 31 U.S.C. § 3730(e)(4)(B) (requiring that "original source" have disclosed the information to the Government before the public disclosure). However, Relators alleged substantially more details regarding the improper referrals than were provided in the prior *qui tam* complaint, and their positions within the Defendant companies attest that their knowledge was gained through their own observation and experience, independent from the prior disclosure. Accordingly, the Court concludes that their knowledge of these matters was acquired "independent of and materially adds to the publicly disclosed allegations or transactions." *Id.* It appears to be undisputed that they voluntarily disclosed what they knew to the Government before filing this action. Accordingly, the Court concludes that the original source exception applies, and their claims regarding improper referrals are not barred by the public disclosure in the prior *qui tam* case.

**B.    *Letters to U.S. Attorney's Office***

Defendants also argue that the facts underlying Relators' claims regarding backdated CTI's and face-to-face attestations were publicly disclosed by Defendants to the U.S. Attorney's office while the prior qui tam case was pending. Defendants provided a sworn declaration from its corporate counsel to this effect. Exhibit 1 to Motion to Dismiss [47-2], at 2. Also, Defendants attached correspondence from 2014 in which they disclosed these matters to Assistant United States Attorney Angela Williams in response to a subpoena that was issued as part of the investigation of the prior *qui tam* complaint. *Id.* at 4-7. The correspondence concerned the actions of Defendants' former employees, Kellie Compton and Carla Schuler, who are prominently mentioned in the Second Amended Complaint as key figures in the allegations concerning backdated CTI's and face-to-face attestations. It is indisputable that the prior correspondence to the U.S. Attorney's office concerns the same events alleged by Relators. Therefore, the Court finds that there was a prior public disclosure of Relators' allegations concerning backdated CTI's and face-to-face attestations, and that Relators' claims were based on the public disclosure.

Relators argue that Defendants' self-reporting does not fall within the statutory definition of a public disclosure. Relators cited no case law categorically excluding self-reported matters from the definition of a public disclosure. According to the statute, a public disclosure occurs when the allegations or transactions are disclosed in "a congressional, Government Accountability Office, or other Federal . . . investigation . . . ." 31 U.S.C. § 3730(e)(4)(A)(ii). The U.S. Attorney's investigation of

the claims in the previous *qui tam* action is a federal investigation. Therefore, the Court concludes that the correspondence to AUSA Williams, cited above, falls within the statutory definition.

Relators also argue that the Court can not consider the correspondence because it is outside the pleadings. As noted above, "the Fifth Circuit has noted that a challenge under the FCA's public disclosure bar should be treated as a motion for summary judgment, as it is necessarily intertwined with the merits of the case." *Jamison*, 2010 WL 1276712 at *1. The Court notified the parties that it intended to apply Rule 56 and gave Relators an opportunity to present evidence in support of their response to Defendants' motion. *See* Order [52]. Therefore, the Court may consider the correspondence.

Although the Court has concluded that Relators' allegations of backdated CTI's and face-to-face attestations were based on a prior public disclosure, those claims may proceed if Relators are the "original source" of the publicly disclosed information. *Solomon*, 878 F.3d at 146. The Fifth Circuit uses a two-part test when applying the original-source exception: "(1) the relator must demonstrate that he or she has direct and independent knowledge of the information on which the allegations are based and (2) the relator must demonstrate that he or she has voluntarily provided the information to the Government before filing his or her qui tam action." *Id.*

Relators have not alleged or provided any evidence that they disclosed the information about Kellie Compton and Carla Schuler backdating CTI's and face-to-

face attestations to the Government prior to Defendants' disclosure to the U.S. Attorney's office in 2014. *See* 31 U.S.C. § 3730(e)(4)(B) (requiring that "original source" have disclosed the information to the Government before the public disclosure). Moreover, Relators' original Complaint contains no additional allegations that materially add to those disclosed to the U.S. Attorney's office in 2014. *See* Complaint [3], at 15-16; 31 U.S.C. § 3730 (e)(4)(B) (requiring that an original source must have knowledge that materially adds to what was publicly disclosed). Therefore, the Court finds that the original source exception does not apply to the public disclosure in the correspondence to the U.S. Attorney's office in response to the Government's subpoena in the prior *qui tam* case. Accordingly, Relators' claims related to the backdated CTI's and face-to-face attestations are barred by 31 U.S.C. § 3730.

### III. OTHER ARGUMENTS

The Court addresses Defendants' remaining arguments under Rule 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Great Lakes Dredge & Dock Co. LLC v. La. State*, 624 F.3d 201, 210 (5th Cir. 2010) (punctuation omitted). "To be plausible, the complaint's factual allegations must be enough to raise a right to relief above the speculative level." *Id.* (punctuation omitted). The Court must "accept all well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff." *Id.* But the Court will not accept

as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Id.* Likewise, "a formulaic recitation of the elements of a cause of action will not do." *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 417 (5th Cir. 2010) (punctuation omitted). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009).

Additionally, "complaints under the FCA must comply with Rule 9(b), which provides that '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" *United States ex rel. Rigsby v. State Farm Fire & Cas. Co.*, 794 F.3d 457, 466 (5th Cir. 2015). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b).

> Rule 9(b) generally requires the plaintiff to plead the time, place, and contents of the false representation and the identity of the person making the representation. However, an FCA claim can meet Rule 9(b)'s standard if it alleges "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."

*United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 260 (5th Cir. 2014) (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)). The typical "'time, place, contents, and identity' standard is not a straitjacket for Rule 9(b)." *Grubbs*, 565 F.3d at 190. The "rule is context specific and flexible and must remain so to achieve the remedial purpose of the False Claim Act." *Id.* A "plaintiff does not necessarily need the exact dollar amounts, billing numbers, or dates to prove

to a preponderance that fraudulent bills were actually submitted," and, therefore, he does not necessarily have to plead such details to survive a motion to dismiss. *Id.*

## A.    *Particular Allegations Against Each Defendant*

First, Defendants argue that Relators' allegations are not sufficiently particular because they collectively refer to the Defendants, rather than distinguishing between them. In other words, Defendants argue that Relators must specify which of the two named Defendants committed each act alleged in the Second Amended Complaint.

Rule 9(b) provides: "In alleging fraud . . . , a party must state with particularity the circumstances constituting the fraud or mistake." FED. R. CIV. P. 9(b). Applying this rule, the Fifth Circuit has suggested that an FCA plaintiff must plead "the identity of the corporate actor with particularity." *United States ex rel. Hebert v. Dizney*, 295 F. App'x 717, 722 (5th Cir. 2008). However, in *Hebert*, the plaintiffs named twenty-one corporate and six individual defendants. *Id.* That is a far different situation than here, where Relators named only two corporate Defendants, St. Joseph Hospice, LLC and St. Joseph's Holdings, LLC. Moreover, most of the Fifth Circuit's discussion in *Hebert* focused on the "what, when, or where" of the false allegations, rather than the identity of the corporate entity submitting the allegedly false claim. *Id.* at 721-24.

As noted above, "Rule 9(b) generally requires the plaintiff to plead the time, place, and contents of the false representation and the identity of the person making

the representation," but "an FCA claim can meet Rule 9(b)'s standard if it alleges particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Bollinger Shipyards*, 775 F.3d at 260. In the Court's opinion, Relators provided sufficient information for Defendants to answer the allegations and conduct discovery. One does not read a pleading's factual allegations in isolation from one another. Rather, they are read within the context of the whole. The Second Amended Complaint contains enough context for Defendants to discern which allegations apply to each of them.

## B.    *Knowledge*

Next, Defendants argue that Relators did not sufficiently plead knowledge. Specifically, Defendants argue that Relators failed to allege that anyone knowingly submitted a fraudulent claim based upon the conduct alleged in the Second Amended Complaint.

The FCA imposes civil penalties on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). "The terms 'knowing' and 'knowingly' mean that a person '(i) has actual knowledge of the information; (ii) acts with deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information.'" *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 (5th Cir. 2010) (quoting 31 U.S.C. § 3729(b)(1)(B)). Rule 9 provides that "knowledge . . . may be alleged generally." FED.

R. Civ. P. 9(b).

Relators alleged that Darlene Thomas personally observed the fraudulent activity alleged in the Second Amended Complaint "in IDT meetings, weekly KPI conference calls, pharmacy conference calls, and various other meetings and phone calls involving St. Joseph senior management and administrators." Second Amended Complaint at 4, *United States ex rel. Thomas v. St. Joseph Hospice, LLC*, No. 2:16-CV-143-KS-MTP (S.D. Miss. Aug. 13, 2018), ECF No. 45. She allegedly "reported the improper activity as improper to Pat Mitchell, CEO; Anthony Martinez, VP of Hospice; Carla Bonvillan, Compliance Officer; and Jeff Morthland, Corporate Attorney by writing a letter listing some of the fraudulent activity she had witnessed." *Id.* Thomas claims that "executive management" later called her to a meeting where she was "coerced to sign a declaration that [she was] aware of no wrongdoing by St. Joseph's Hospice." *Id.* She alleges that when she returned from the meeting, "all of the patient records had been removed from the Hattiesburg office" and taken to Wiggins, where material alterations were made to them. *Id.* at 4-5.

Additionally, Relators alleged that the Picayune Medical Director refused to sign a declaration that he was not "given anything of value for referrals and that he was never asked to refer patients to St. Joseph." *Id.* at 27. The physician, Dr. Gipson, allegedly "said that he was not comfortable signing the document," and that "he was concerned with the referrals and felt that they were inappropriate for hospice admission." *Id.* at 27-28.

In summary, Relators alleged that Darlene Thomas informed senior executives of the fraudulent activity, and that in response to her correspondence, Defendants coerced her to sign a declaration absolving them of wrongdoing while they altered patient records to cover their tracks. Relators also alleged that a Medical Director told Defendants' administrators that he believed patients were being inappropriately referred for hospice services. These allegations are sufficient to state Defendants' knowledge of the fraudulent activities alleged in the Second Amended Complaint.

## C.    *Presentment*

Next, Defendants argue that Relators failed to plead sufficiently particular allegations of presentment. Defendants apparently contend that Relators must allege the specific dates, amounts, services provided, and places of the alleged false claims.

To state a claim under Section 3729(a)(1)(A), one must allege: "(1) a false statement or fraudulent course of conduct; (2) that was made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money (i.e., that involved a claim)." *United States ex rel. Spicer v. Westbrook*, 751 F.3d 354, 365 (5th Cir. 2014). Presentment of a claim is the act giving rise to liability under Section 3729(a)(1)(A), and "[f]raudulent presentment requires proof only of a claim's falsity, not its exact contents." *Grubbs*, 565 F.3d at 189. A relator "does not necessarily need the exact dollar amounts, billing numbers, or dates to prove to a preponderance of the evidence that fraudulent bills were actually submitted." *Id.* at 190. Therefore, such details are not required at the pleading stage. *Id.* at 189-90. As

noted above, "a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 190.

Relators alleged specific details of schemes to submit false claims. First, they alleged that Defendants marketed their hospice services at community events, while instructing their staff to imply to those in attendance that their conditions made them eligible for free hospice benefits, without regard for their actual medical condition. Second Amended Complaint [45], at 27. Second, Relators alleged that Defendants' Medical Directors would sometimes write referrals to hospice, rather than a patient's treating physician. *Id.* at 27. Third, Relators alleged that Defendants instructed their staff to "change patient diagnoses to something that allowed reimbursement" for hospice services, without first seeing the patients. *Id.* at 32. Relators referred to specific correspondence from Defendants' CEO directing their Executive Directors to instruct billing staff to make the changes. *Id.* at 32-33. In support of these general allegations, Relators alleged that specific patients were admitted on specific dates, and that fraudulent claims were submitted in relation to those specific services/patients. *Id.* at 28, 31-32, 34.

In the Court's opinion, Relators alleged enough "details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Grubbs*, 565 F.3d at 190. As noted above, a relator "does

not necessarily need the exact dollar amounts, billing numbers, or dates to prove to a preponderance of the evidence that fraudulent bills were actually submitted." *Id.* at 190. Therefore, Relators pleaded enough facts to survive a motion to dismiss under Rule 12(b)(6).

## D.    *Certification (Non-AKS Claims)*

Defendants argue that Relators' reliance upon Form CMS-855A to support allegations of false certification is erroneous. Defendants contend that Form CMS-855A contains no acknowledgment that payment is conditioned upon compliance with applicable conditions of participation. Defendants cited cases from outside this jurisdiction in support of their argument, but they did not attach a copy of the relevant form or direct the Court to where one can be found. *See* Memorandum in Support of Motion to Dismiss at 14, *United States ex rel. Thomas v. St. Joseph Hospice, LLC*, No. 2:16-CV-143-KS-MTP (S.D. Miss. Aug. 28, 2018), ECF No. 48. The Court declines to search for evidence to support Defendants' argument.

Next, Defendants argue that Relators' reliance upon CMS Form 1450 to support claims of false certification is erroneous. Defendants contend that the form's certification language can not form the basis of a false certification claim, citing *United States v. Catholic Health Sys. of Long Island Inc.*, 2017 WL 1239589, at *20 (E.D.N.Y. Mar. 31, 2017), in which the court held that the certifications on Form 1450 were "too vague and broad to support FCA claims based on express-false-certification arguments."

Form 1450 contains numerous certifications.[5] The Court need not discuss them with any specificity because Defendants did not do so in briefing. Absent controlling Fifth Circuit precedent or, at the very least, more specific argument on the issue, the Court declines to categorically bar all false certification claims based on the submission of CMS Form 1450.

Defendants argue that Relators failed to allege sufficient facts in support of the non-AKS false certification claims. Defendants contend that Relators failed to allege the statutes or regulations violated, any certifications of compliance with such statutes or regulations other than Form CMS-855A, what was stated in such certification, how it was false, who made the certification, or that the Government would have declined payment but for the allegedly false certifications.

"Under a false certification theory, a defendant can be liable under the FCA for a legal violation if the government requires a certification of compliance with a statute or regulation and the claimant falsely certifies compliance." *United States ex rel. Guth v. Roedel Parsons Koch Blache Balhoff & McCollister*, 626 F. App'x 528, 533 (5th Cir. 2015). But "claims for services rendered in violation of a statute do not necessarily constitute false or fraudulent claims under the FCA." *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997). Rather, "where the government has conditioned payment of a claim upon a claimant's

---

[5] A copy of the form can be found on the CMS website: https://www.cms.gov/Regulations-and-Guidance/Legislation/PaperworkReductionActof1995/PR-Listing-Items/CMS-1450.html.

certification of compliance with . . . a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation." *Id.* False certifications can be express or implied. *See, e.g. United States ex rel. Academy Health Ctr., Inc. v. Hyperion Foundation, Inc.*, 2014 WL 3385189, at *35 (S.D. Miss. July 9, 2014). Relators alleged both theories here.

Among other things, Relators alleged that Defendants altered patient diagnoses to ensure that claims would be paid. Second Amended Complaint [45], at 32-33. For example, Relators alleged that "all patients that were diagnosed with dementia or failure to thrive were changed to a diagnosis of Alzheimer's even though the patient did not have Alzheimer's disease." *Id.* at 33. Relators alleged specific examples of this practice, alleging the patients' initials and admission dates. *Id.* at 34. Relators also alleged that Defendants were "required to expressly or impliedly certify compliance with the Medicare, Medicaid, and Social Security laws and regulations" to receive payment, and that Defendants impliedly certified compliance with federal law every time they submitted a claim for payment. *Id.* at 10.

*Guth*, cited by Defendants, is inapposite because there, the relator generally alleged that the defendant had "violated the federal regulations of HUD and the CDBG program," without citing specific regulations, asserting that they required certifications of compliance, or alleging that the defendant had falsely certified compliance. *Guth*, 626 F. App'x at 533. Likewise, in *Gage*, the relator failed to allege "what was false about the claims or how they were false." *United States ex rel. Gage*

*v. Davis S.R. Aviation, LLC*, 623 F. App'x 622, 626 (5th Cir. 2015). Here, Relators have, at a minimum, pleaded sufficient facts to state false certification claims related to altered patient diagnoses. Relators could have more clearly delineated their various theories of liability. However, they alleged enough facts to state some false certification claims, and the Court declines to dismiss all of their false certification claims pursuant to 12(b)(6).

## E. *Employee Ambassador Program*

Defendants argue that providing bonuses to employees for referring hospice patients is not a violation of the AKS because the statute includes a safe harbor for payments by employers to bona fide employees. *See* 42 U.S.C. § 1320a-7b(b)(3)(B); 42 C.F.R. § 1001.952(i). "The bona fide employee exception is an affirmative defense on which Defendants bear the burden of proof." *United States v. Vista Hospice Care, Inc.*, 2016 WL 3449833, at *22 (N.D. Tex. June 20, 2016). A plaintiff need not plead facts to counter an anticipated affirmative defense to avoid dismissal under Rule 12(b)(6). *See Wilson v. Kimberly-Clark Corp.*, 254 F. App'x 280, 287 (5th Cir. 2007); *Odom v. Am. Nonwovens Corp.*, 2010 WL 3782426, at *2 (N.D. Miss. Sept. 20, 2010). If Defendants want the Court to address the bona fide employee safe harbor, then a motion for summary judgment is the appropriate mechanism.

## F. *Medical Director Referrals*

Relators allege that Defendants' Medical Directors were paid for patient referrals. Defendants argue that they were not, in fact, paid for referrals, citing

documents attached to their motion. This is a factual dispute, and, as such, it can not be addressed in a motion to dismiss. The Court must accept the factual allegations of Relators' Second Amended Complaint as true. *Great Lakes Dredge & Dock*, 624 F.3d at 210.

Defendants also argue that Relators alleged insufficient facts to state an AKS violation. Defendants contend that Relators failed to connect the listed patients to a kickback, failed to allege a specific kickback tied to a specific referral, and failed to allege a specific agreement between them and any Medical Director to provide remuneration in exchange for referrals.

As noted above, "[c]laims brought under the FCA are fraud claims that must also comply with the supplemental pleading requirements of Rule 9(b), demanding that 'a party must state with particularity the circumstances constituting fraud or mistake.'" *United States ex rel. Nunnally v. West Calcasieu Cameron Hosp.*, 519 F. App'x 890, 892 (5th Cir. 2013). But "[i]n the context of the FCA, we have explained that Rule 9(b) is 'context specific and flexible,' and noted that a plaintiff may sufficiently state a claim with particularity 'without including all the details of any single court-articulated standard – it depends on the elements of the claim in hand.'" *Id.* at 892-93 (quoting *Grubbs*, 565 F.3d at 189-90). A relator can, "in some circumstances, satisfy Rule 9(b) by providing factual or statistical evidence to strengthen the inference of fraud beyond mere possibility, without necessarily providing details as to *each* false claim." *Id.* at 893. Instead, the relator can "provide

other reliable indications of fraud and . . . plead a level of detail that demonstrates that an alleged scheme likely resulted in bills submitted for government payment." *Id.*

Defendants argue that the Second Amended Complaint "merely offers sweeping and conclusory allegations of 'verbal agreements' between [the Defendant] and 'various physicians,' without a shred of detail or particularity," regarding the "contents of those agreements, the identity of any physicians, actual inducements, or improper referrals." *Id.* at 894. The Court disagrees with Defendants' assessment of the Second Amended Complaint.

Relators pleaded substantial details of the alleged agreement. They alleged that Defendants paid their Medical Directors varying rates depending on the "volume and value of each physician's referrals," and that Defendants would alter the hours for which they paid each Medical Director depending on his or her referrals, and "make up documentation to support those hours." Second Amended Complaint [45], at 18. Relators specifically alleged that Defendants' office manager in Hattiesburg, Penni Ellington, "would fill in the compensation sheet and make up time entries for the Medical Directors" that did not correspond to their actual time working. *Id.* Relators also alleged that Defendants' Vice-President ordered one of them to "make up log hours" for two Medical Directors "to equal the maximum payment available on their contract and to keep them happy and generate referrals." *Id.* at 18-19. Relators were allegedly responsible for obtaining the Medical Directors' signatures on falsified

time sheets. *Id.* at 19. When a Medical Director stopped "bringing in referrals," Defendants instructed Relators to reduce the Medical Directors' pay. *Id.* Relators named the specific persons employed by Defendants who gave these orders. *Id.* at 19-20. Relators also named multiple Medical Directors who received compensation under this system. *Id.* at 19-20, 22-24. Finally, Relators alleged specific patients referred by specific Medical Directors in exchange for remuneration, and the specific dates on which they were admitted. *Id.* at 23-24.

These allegations are "reliable indications of fraud," and Relators pleaded "a level of detail that demonstrates that an alleged scheme likely resulted in bills submitted for government payment." *Nunnally*, 519 F. App'x at 893.

## G.   *Improper Referrals*

Defendants argue that Relators provided insufficient facts to support their claims that Medical Directors would refer patients who did not meet the criteria for hospice services.

Relators alleged that Defendants' employees "were instructed to approach . . . people and imply that their condition made them eligible for free hospice Medicare benefits that would provide them pain meds and in home care." Second Amended Complaint [45], at 27. According to Relators, in some cases "a Medical Director from St. Joseph would write the referral themselves rather than the patient's treating physician." *Id.* Relators alleged that they were present when Defendants asked a Medical Director to "sign a Medical Director Declaration . . . that he was never asked

25

to refer patients to St. Joseph." *Id.* The Medical Director allegedly declined because he was "concerned with the referrals and felt that they were inappropriate for hospice admission." *Id.* at 27-28. Relators cited two specific examples of improper patient referrals, alleging the patients' initials, admission dates, and medical conditions. *Id.* at 28. These are sufficient facts to state a claim that Defendants admitted patients who did not meet the criterial for hospice services.

## H.    *Altering Diagnoses*

Defendants argue that they did not alter any patients' diagnosis to get reimbursement from Medicare. Rather, Defendants claim that they "clarified coding requirements" in response to a CMS Hospice Manual Update in October 2014. This is a factual dispute, and, as such, it can not be addressed in a motion to dismiss. The Court must accept the factual allegations of Relators' Second Amended Complaint as true. *Great Lakes Dredge & Dock*, 624 F.3d at 210.

Defendants also argue that Relators pleaded insufficient facts to support their claim that Defendants had a company-wide policy to change diagnoses to ensure reimbursement. Relators alleged that Defendants altered patient diagnoses to ensure that claims would be paid. Second Amended Complaint [45], at 32-33. Relators cited correspondence from Defendants' CEO, Pat Mitchell, in which he directed all of Defendants' Executive Directors – including one of the Relators – to "change the primary diagnosis codes in the computer immediately from a non-billable code . . . to a payable diagnosis code . . . ," without any medical professional re-evaluating the

patient. *Id.* For example, Relators alleged that "all patients that were diagnosed with dementia or failure to thrive were changed to a diagnosis of Alzheimer's even though the patient did not have Alzheimer's disease." *Id.* at 33. Relators alleged specific examples of this practice, alleging the patients' initials and admission dates. *Id.* at 34. According to Relators, this practice persisted from 2013 to present. *Id.* at 6. These allegations are sufficient to state a claim that Defendants altered diagnoses to ensure reimbursement.

## I.    *Staffing*

Defendants argue that Relators provided insufficient facts to support their claim that Defendants had a company-wide policy or practice of inadequate staffing.

Relators alleged that Defendants' "nursing staff was so overwhelmed with patients that they could not possibly provide appropriate care for their patients that was consistent with their plans of care." *Id.* at 34. Relators cited two specific examples of understaffing, at two separate facilities. *Id.* According to Relators, these conditions persisted from 2013 to present. *Id.* at 6. Therefore, Defendants have notice of an alleged practice, a time period, two specific locations at which the practice occurred, and two specific employees who participated in the practice. In the Court's opinion, these allegations are barely sufficient to satisfy Rule 12(b)(6).

## J.    *Supplies/Pharmacy*

Defendants argue that Relators provided insufficient facts to support their claim that Defendant had a company-wide policy or practice of providing inadequate

pharmaceuticals and supplies.

Relators alleged that Defendants' employee, Carla Schuler, told them that Defendants would not pay for a patient's prescribed "common pain medicine combination[ ] used in hospice patient care" because "they would only pay for one medication and . . . this patient was already receiving a pain medicine." *Id.* at 35. Relators further alleged that Defendants would not provide the following "commonly prescribed" Alzheimer's and dementia medications to their patients: Aricept, Namenda, and Exelon patches. *Id.* at 35-36. Relators also alleged that more than one patient discontinued Defendants' services because they could not received adequate medication. *Id.* at 36. Relators alleged twelve specific patients for whom Defendants would not provide adequate medications, providing their initials, admission dates, and brief descriptions of their conditions and the medications Defendants would not provide. *Id.* at 36-38. These are sufficient facts to support a claim that Defendants had a company-wide policy or practice of providing inadequate medications.

*Hebert*, cited by Defendants, is inapposite. There, the relators only alleged that the defendants "provided false information . . . regarding the quality of care . . . in the course of negotiating for Medicare and Medicaid contracts . . . ." *Hebert*, 295 F. App'x at 722. Here, Relators provided specific details regarding the alleged inadequacy of the standard of care, including twelve specific examples of patients who were denied prescribed medications.

**K.    Count II – Section 3729(a)(1)(B)**

Defendants argue that Relators did not plead sufficient facts to state a claim under Section 3729(a)(1)(B). In response, Relators contend that their allegations concerning falsified CTI's state a claim under Section 3729(a)(1)(B). As provided above, Relators' claims based on falsified CTI's are barred by 31 U.S.C. § 3730. Relators identified no other facts in support of Count II's assertion of claims under 31 U.S.C. § 3729(a)(1)(B). Therefore, the Court grants this aspect of Defendants' motion.

## L.  *Count III – Independent AKS Claim*

Finally, Defendants argue that the AKS does not provide an independent, private right of action. Defendants are correct. "The AKS provides no private right of action; therefore, a private plaintiff may not sue a health care provider under the AKS alone." *Nunnally*, 519 F. App'x at 893 n. 5 (citing 42 U.S.C. § 1320a-7b(b)(1-2)).[6] To the extent Relators intended to plead an independent cause of action under the AKS, that claim is dismissed.

## IV. CONCLUSION

For these reasons, the Court **grants** Defendants' Motion to Dismiss [47] **in part and denies it in part**. Specifically:

- Relators' claims related to backdated CTI's and face-to-face attestations are barred by 31 U.S.C. § 3730.

---

[6]*See also Ameritox, Ltd. v. Millenium Labs., Inc.*, 803 F.3d 518, 522 (11th Cir. 2015); *Rzayeva v. United States*, 492 F. Supp. 2d 60, 78 (D. Conn. 2007); *United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 37 (D. D.C. 2003); *United States ex rel. Okeeffe v. River Oaks Mgmt. Co.*, No. 2:16-CV-48-KS-MTP, 2017 WL 4685001, at *1-*2 (S.D. Miss. Oct. 18, 2017); *United States ex rel. Hartwig v. Medtronic, Inc.*, No. 3:11-CV-413-CWR-LRA, 2014 U.S. Dist. LEXIS 44475, at *48 n. 15 (S.D. Miss. Mar. 31, 2014).

- Count II of the Second Amended Complaint, Relators' claims under 31 U.S.C. § 3729(a)(1)(B), are dismissed because Relators' claims related to backdated CTI's are barred by 31 U.S.C. § 3730.

- Count III of the Second Amended Complaint, Relators' independent cause of action under the AKS, is dismissed because the AKS does not provide a private right of action.

- The Court denies Defendants' Motion to Dismiss [47] in all other respects.

SO ORDERED AND ADJUDGED this 19th day of March, 2019.

_____/s/ Keith Starrett_____
KEITH STARRETT
UNITED STATES DISTRICT JUDGE
